200 So. 142

Succession of FONTANO.

No. 35558.

Jan. 6, 1941.

Deutsch and Kerrigan and Marian Mayer, all of New Orleans, for Santa Puma Davi, Dominico Puma, and Anna Puma, appellants.

George Piazza and B. M. Goodman, both of New Orleans, for Filipo Puma, tutor, appellee.

FOURNET, Justice.

This is an appeal from a judgment homologating, with the exception of certain items which were rejected in the

lower court, a tutor's account of the administration of community property in which his three minor children by a previous marriage had inherited their mother's interest.

Stephana Fontano died intestate on January 5, 1931, leaving as her sole heirs three minor children, Santa, Dominico, and Anna Puma, aged twelve, eight, and three years respectively, issue of her marriage to Filipo Puma, who also survived her. On July 17, 1931, Puma opened his wife's succession, which consisted entirely of her interest in four pieces of real estate in the city of New Orleans belonging to the community formerly existing between them, and being (1) a lot and house at 1480–1482 North Claiborne Avenue, valued at $3,-500; (2) a vacant lot at 1500–1502 North Claiborne Avenue, valued at $1,400; (3) a lot and house on Caffin Avenue, valued at $3,000; and (4) a lot and house at 1637 North White Street, valued at $3,-500. On July 21 following Puma qualified as natural tutor of his children, and by judgment of court dated July 24, 1931, he and the minor children were placed in possession of their respective undivided half interests in the community estate, the share of the children being subjected to their father's usufruct. On February 21, 1934, Puma remarried. On December 1, 1937, he filed the first account of his administration, covering the period between the date of his remarriage and December 1, 1937. The account was opposed by Santa Puma, the eldest child, who had become emancipated

by marriage, and, on behalf of the minors Dominico and Anna Puma, by the undertutor, John Davi.

The opposition is to each and every item listed in the account and is based on the contentions of the opponents that the account does not reflect all of the revenues derived from the several properties; that the majority of the items charged against them are not chargeable under the law; and that the following mortgages placed upon their properties during the tutor's administration are illegal and null as to them: (1) A mortgage of $5,000 in favor of Vito Sortino —$754.97 of the money borrowed being used to retire a pre-existing mortgage, the remainder to construct a building on the vacant lot on North Claiborne Avenue. (2) A later mortgage of $1,150, also in Sortino's favor, securing money borrowed to pay back interest due on the $5,000 loan and back taxes on the property securing the said loan. (3) A mortgage for $1,700 in favor of Samuel J. Kunnes securing money used in purchasing a home on North Tonti Street, the house in which they had been living on Caffin Avenue having been destroyed by fire. (4) The two subsequent mortgages involved in the refinancing of the Kunnes loan, i. e., one in favor of the Orleans Homestead Association for $2,500 and the other in favor of Vito Sortino for $950. There is an additional and specific opposition on the part of Santa Puma to these last two mortgages and to the sale of the Caffin Avenue property for the reason

that at the time these transactions were executed she was an emancipated minor and did not sign them.

"The tutor can not borrow for the minor, purchase for him immovable or compromise respecting his rights, without an authority from the judge, granted on the advice of a family meeting." Article 353 of the Revised Civil Code. It is only when a family meeting declares it "is of absolute necessity, or of evident advantage to the minor" that the immovables of the minor can be sold or mortgaged (Article 339), in which case the family meeting shall set forth the reasons for its declaration "in order that the judge may decide whether he ought to cause it to be homologated or not." Article 340. Act No. 110 of 1920 dispensed with the necessity of the family meeting in all cases where the tutor and undertutor concur.

The above provisions for the alienation of the immovable property belonging to the minor were adopted by our law makers and codifiers to safeguard and protect the minors' interests and their strict construction has been consistently adhered to by our courts. A review of our jurisprudence will disclose that this court has always looked with disfavor upon the burdening of a minor's estate with loans and mortgages which are speculative in character and has held that a tutor cannot, even with the advice of the family meeting and the authority of the court, burden any portion of the minors' estate in order to purchase property for them on terms

of credit. Hall v. Woods, 4 La.Ann. 85; Williams v. Chotard, 11 La.Ann. 247; and Randlett v. Gordy, 32 La.Ann. 904. It has been held, however, that a tutor may, upon compliance with the requisite legal formalities, sell or mortgage property in which the minors have an interest to secure money in order (1) to pay debts of the succession or pre-existing debts of the community (Succession of Hickman, 13 La.Ann. 364, and Succession of De Lerno, 34 La.Ann. 38); (2) to pay pressing claims against the estate inherited by the minors (Michel's Heirs v. Michel's Curator, 11 La. 149; Lalanne's Heirs v. Moreau, 13 La. 431; and Succession of Fluker, 32 La. Ann. 292); (3) to operate a plantation belonging to the minors (Leisey v. Tanner & Helm, 28 La.Ann. 299, and Scottish-American Mortgage Co. v. Ogden, 49 La.Ann. 8, 21 So. 116); and (4) to pay taxes, repair and improve property belonging to them, Fontenette v. Veazey, 1 La.Ann. 236; Beauregard v. Leveau, 30 La.Ann. 302; and Spence & Goldstein v. Clay, 169 La. 1030, 126 So. 516, 517.

In the latter case we held that: "Where the court is vested with jurisdiction and its proceedings are regular, the lender of the money is protected by the decree authorizing the mortgage, and is not obliged to see that the money advanced by him is applied properly by the tutor or that the transaction is to the advantage of the minors."

Opponents do not dispute the fact that Puma, in obtaining the authority of

court for the several transactions, complied with all of the requisite legal formalities, but it is seriously argued by opponents' counsel that the transactions on their face show they are not of absolute necessity or of evident advantage to the opponents and are, therefore, null as to them; consequently, that the property or its value should be returned to them unencumbered.

The objection to the $5,000 mortgage is that the tutor has failed to prove the application of the loan for the use and benefit of the minors for the reason that the $754.97 debt forming a basis for the loan was not their debt or that of their mother's estate and that the balance was used in the erection of a building that was a speculative venture inuring solely to the benefit of the tutor and usufructuary, Puma. They contend that because the $1,150 mortgage was negotiated to secure money borrowed to pay interest on the $5,000 loan and taxes due on the property, including the building erected, it is likewise null.

The $1,700 mortgage to Kunnes is objected to for the reason that it was given to secure money used in purchasing property for the minors on credit; and because the $2,500 and the $950 mortgages were involved in the refinancing of the $1,700, they are also objected to as being invalid.

However, while contesting these transactions, the opponents are demanding an accounting from their tutor of the revenues derived from the building con-

structed with the money borrowed on the $5,000 mortgage and those derived from the new property purchased with the money borrowed on the $1,700 mortgage.

In the recent case of Wallace v. Cassiere, 192 La. 581, 188 So. 707, 710, we held the principle previously enunciated by this court to the effect that "neither law, equity, nor good conscience will allow one to claim the benefits and at the same time escape the obligations of an undertaking" to be applicable to minors.

A review of the record in the instant case reveals that in February of 1933 Puma obtained authority to compromise a fire insurance claim for the partial destruction of the dwelling house on Caffin Avenue for $3,375.24, which amount, in its entirety, was applied toward liquidating the $5,000 mortgage held by Sortino and that at the time Puma filed his account a balance was due on this note in the amount of $1,026.71. With the $2,500 borrowed from the Orleans Homestead Association Puma retired the $1,700 mortgage held by Kunnes, repaired the Caffin Avenue property damaged by fire, and paid back taxes due on the property. In 1935 Puma sold the Caffin Avenue property for $1,450. With this amount and $950 which he borrowed from Sortino in October of the same year, Puma completely liquidated the balance due the Orleans Homestead Association on the $2,500 mortgage at that time. It appears, therefore, that at the time Puma filed his final account the only mortgages outstanding against the common property were those due Sortino, i. e., the balance on the $5,000 mortgage and the mortgages of $950 and $1,150. The record fails to show, however, that the various mortgages which appear to have been paid have been cancelled.

While these proceedings were pending in the lower court, Sortino instituted foreclosure proceedings and John Davi, the undertutor of the minors Dominico and Anna Puma, obtained an order of court to enjoin the foreclosure proceedings on October 14, 1938. Subsequently, on November 29, 1938, Puma sought authorization from the court, in which he was joined by Davi, to sell the North Tonti Street property for $2,700, with the understanding that $950 of this amount would be used to retire the mortgage given Sortino in October of 1935 and the remainder toward liquidating the balance due on the $5,000 mortgage. It necessarily follows, therefore, that if the authorization secured was complied with, and we are led to understand it was, the $1,700 loan from Kunnes and all of the subsequent transactions involved in the refinancing of same have been liquidated, leaving outstanding against the property only the $1,150 mortgage in Sortino's favor on the North White Street property, with whatever interest may be accrued thereon.

■ Under these circumstances we do not believe the opponents should be allowed to profit by the building erected on the vacant property, by the property purchased on North Tonti Street, or the proceeds of the

sale thereof, and, at the same time, avoid the obligations incurred in connection therewith, particularly when every act of the tutor in this case reflects his utmost good faith and shows that he was at all times endeavoring to make the property not only more productive of revenue and more valuable, but also to retire the obligations incurred in doing so. This, it seems, he has accomplished.

■ Santa Puma Davi's individual opposition to the $950 and $2,500 mortgages necessarily becomes moot if these mortgages have been paid, and the record indicates they have. The only disposition that could be made of her objection to the sale of the Caffin Avenue property because she did not sign the act of sale would be from the standpoint of an accounting of the proceeds thereof, since the title to the property is not at issue in this case, and the purchaser of the property, who would be a necessary party, has not been joined in these proceedings.

■■ The reason assigned by opponents for their conclusion that the $754.97 debt is not chargeable to them or to their mother's estate is that Puma is bound by his judicial admission or confession in the petition to have himself and the minors placed in possession of the property that the succession of his wife owed no debts. Opponents are mistaken in this conclusion, for the judicial confession may be *revoked* if it is proved to have been made through an error of fact. Article 2291 of the Revised Civil Code. On this point the record shows that Puma on the day following the one on which he made the alleged judicial confession filed another petition for authority to borrow the $5,000

in contest here, making the contrary allegation that the community did owe Sortino a balance of $700, plus interest amounting to $54.97, on two mortgages executed in 1923, during the existence of the community between himself and the mother of opponents, and that the loan was necessary to avoid a foreclosure thereon. On the trial of the case Puma testified these mortgages were executed to secure two loans from Sortino, one for $1,300 in March of 1923 and the other for $4,500 in April of the same year. The evidence also shows this balance was paid to Sortino from the proceeds of the $5,000 loan on July 21, 1931. It is our opinion, therefore, that the uncontradicted evidence shows the debt was a community debt and counsel's objection in this respect is without merit.

However, the evidence in this case is lacking in many instances, and in order that justice may be done to all of the parties involved, we have concluded to remand it to the lower court to the end that this evidence may be supplied, particularly with respect to the authorization granted by the court for the sale of the North Tonti Street property and the disposition that has been made of the proceeds of the sale of this property if it has been sold; also, with reference to the cancellation of the several mortgages which appear to have been paid.

The conclusion we have reached makes it unnecessary at this time for us to pass on opponents' objection that from the evidence it is, in almost all instances, impossible to determine which of the expenditures for repairs and upkeep charged against them were for properties in which they had an

interest and which were for the North Tonti Street property.

Opponents' counsel contends that Puma, in attempting to prove the many items charged against the opponents—some two hundred in number—has failed to carry the burden of proof since the only evidence to support these items, in addition to the testimony of Puma himself, are the receipts introduced during the course of the trial, which receipts, counsel argues, are worthless and should not have been admitted in evidence for the reason that the signature of the person receiving the payment was not properly proved.

The record discloses that Puma kept no books or systematic account of his tutorship. In rendering and proving his account he depended entirely upon memorandums in receipt books to show what revenues had been derived from the several properties and on receipts of the parties to whom payments were made to show his expenditures. On the witness stand Puma testified the memorandums reflect all of the revenues that came into his hands during the period covered by his final account and that the receipts introduced by him show all of the expenditures made by him during the same period.

In the case of Gray v. Lonsdale, 10 La. Ann. 749, this court said that while "a receipt is not conclusive * * * it is to be deemed prima facie evidence of the fact it asserts and the intention it purports to express; the burden is on the party who desires to contradict or escape from it, to make out a clear case of error or fraud." In the case of Succession of Frantum, 3 Rob. 283, 286, we find that: "When any thing * * is presented to rebut the prima facie evidence, such as extravagant charges, the purchase of articles or supplies not probably needed, or concealment of the funds, or any thing of the kind, courts cannot be too vigilant and strict in their investigations and judgments; but where there is every appearance of good faith and correct management, executors, administrators, tutors, and other fiduciaries, ought not, in the settlement of their accounts, to be held to the strictest rules of evidence. It cannot be expected that they can always have witnesses to their various transactions, and were they obliged to prove the signature to every receipt for debts paid, supplies purchased, or other matters, the expense of summoning witnesses and of their attendance, the taking of depositions and procuring testimony generally, would involve successions and the property of minors, in heavy, and oftentimes unnecessary expenses."

It is our conclusion, therefore, that the trial judge properly overruled opponents' objection to the introduction in evidence of the receipts. Their remedy was to overcome with other evidence the weight given such proof. The record as we find it, however, is so involved and confused—particularly with reference to the items which appear to be duplications, have not been sufficiently explained, or are apparently not supported by vouchers or other proof—that we think it advisable to remand this phase of the case to the lower court for further consideration. In fact, we feel this case strongly suggests the need of an expert accountant to assist the court.

While the case is here, however, we must pass upon the legal question raised by counsel's urgent contention that neither Dominico or Anna Puma can be charged for expenses incurred in maintaining the household (such as groceries, servant's wages etc.) nor for board and lodging since under the express provisions of Article 227 of the Revised Civil Code fathers and mothers are obligated to support, maintain, and educate their children, but that if the minors can be charged for their support the services rendered by Dominico around his father's store and those rendered by Anna around her father's home have more than offset these charges. In any event, opponents argue they cannot be charged for both the maintenance of the household and for board and lodging.

This court, in one of its earlier decisions, correctly analyzed the pertinent articles and authorities with reference to the support of minors as follows: "* * * it is true, that, under art. 243 of the Civil Code [Article 227 of the Revised Civil Code], fathers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children; that they have, during marriage the enjoyment of the estates of their children, until their majority or emancipation (Civ.Code, art. 239 [Article 223 of the Revised Civil Code]), and that the obligations resulting from said enjoyment are, among others, to support and educate their children according to their situation in life. Civ.Code, art. 240 [Article 224 of the Revised Civil Code]. But the administration and enjoyment of the estate of his minor children, is given to the father, during the marriage only. Civ.Code, art. 267. [This article is not included in the Revised Civil Code of 1870 but see Article 223 et seq.] After its dissolution he becomes their natural tutor, and keeps the administration of their property as such, subject to the duties, responsibilities, and obligations prescribed by law with regard to all other tutors. Civ.Code, art. 268. [Article 250 of the Revised Civil Code]. As such, he is bound to account for the revenues of the property of his pupils, subject to the expenses of their education, according to their means and condition in life. (Handy v. Parkison) 10 La. [92] 98. Their expenses must be regulated according to their condition and their fortune, and ought never to exceed their revenues; and, in case of insufficiency of the latter for procuring their education or subsistence, nothing can be taken from the capital of their estate, unless the tutor is authorized to do so by the advice of a family meeting. Civ.Code, art. 343. [Article 350 of the Revised Civil Code.] Thus, it is clear, that the revenues of minors, under the natural tutorship or their father, must be applied to defraying the expenses occasioned by their maintenance and education; that the law makes no distinction as to the kind of tutorship under which their estates are administered; that the alimony due by ascendants to their descendants who are in needy circumstances, is only required and granted in proportion to the wants of the person requiring it. and the fortune of those who owe it (Civ.Code, arts. 245, 246, 247 [Articles 229, 230, and 231 of the Revised Civil Code]) ; and that *when children have prop-*

*erty from which a sufficient income may be derived to provide for their subsistence and. education, the natural obligation of their father ceases, after the dissolution of the marriage; and that then their expenses ought to be provided for out of the revenues of their property, pro tanto at least, if insufficient.* This doctrine is also fully developed by Pothier, Contrat de Mariage, Nos. 384, 390. Merlin, Repertoire de Jurisprudence, verbo, Aliment. Toullier, vol. 2, p. 293. Duranton, vol. 2, p. 387. Favard de Langlade, vol. 1, p. 151; and has been sanctioned by the Court of Cassation in France, in a decision reported by Sirey, vol. 13, partie 1, p. 457." Mercier v. Canonge, 12 Rob. 385. (Italics and brackets ours.)

 It is our opinion, therefore, that while Puma cannot charge the minors with both the maintenance of the household and board and lodging, he is entitled to charge Dominico and Anna an amount commensurate with their station in life for board, provided this amount has not been offset by services rendered by the minors.

 In order to arrive at this amount it will be necessary, first, to determine the net yearly income of the minors, since their board cannot exceed this amount because of Puma's failure to secure authorization from the court, with the concurrence of the undertutor, to expend an amount in excess of their revenues. Having arrived at this amount, it will then be necessary to determine what, if any, services were rendered by the minors and their value. It is impossible for us to determine these amounts from the record in its present condition. There is some evidence, which is not contradicted by Puma, that Dominico rendered services around his father's store and that Anna did render services around her father's home. The evidence on this point is very slight and we have no way of arriving at the value of these services. In fact, it is doubtful that Anna, who was only three when her mother died in 1931 and only six when her father remarried, could have rendered any services that would have wholly compensated for her board. Furthermore, there is nothing in the record that will serve as a guide in the determination of the cost of maintaining and educating children in Dominico's and Anna's station in life so that the proper monthly rate to be charged them may be approximated.

 By his account Puma is seeking to charge Santa Puma Davi $1,125 for her support, and one of the grounds for the opposition to his account is that he has failed to include therein any rent from' himself for his occupation and use of property in which opponents have an undivided half interest and he the other half. While the evidence is very slight on this phase of the case, it appears Puma and the opponents have lived in three different places, first, in the house on Caffin Avenue; second, after the fire, in the house purchased on North Tonti Street; and, third, in the new building erected on North Claiborne Avenue. We have no way of determining the length of time lived in each of these places, the rental value thereof, or what portion, if any, of the houses was used by Santa Puma Davi and her husband. From our view of the case we feel these charges should offset each

other, and that Puma's charge against Santa Puma Davi should be disallowed while the opposition to Puma's account in this respect should also be disallowed.

For the reasons assigned the judgment of the lower court is set aside, and the case is remanded for further proceedings in the lower court consistent with the views herein expressed.

O'NIELL, C. J., does not take part.